UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
State of New York,                                          MEMORANDUM
                              Plaintiff,                    & ORDER


                    -against-


                                                           99-CV-2745 (SLT) (ARL)

National Service Industries, Inc.,

                              Defendant.
-------------------------------------------------X
Appearances of Counsel:

For Plaintiff:     Pedro Medina, Asst. Attorney General, New York, N.Y.
For Defendants:    Beverlee E. Silva, King & Spaulding, Atlanta, GA.

TOWNES, U.S.D.J.

        Defendant moves for summary judgment on Plaintiff's CERCLA and state law claims.

Upon consideration of the written submissions of each party and oral argument on January 7,

2005, and for the reasons set forth below, Defendant's motion is GRANTED.


*BACKGROUND*

        The facts in this case are not disputed for purposes of this summary judgment motion.

This case arises out of an action by the State of New York ("Plaintiff" or "State") under Section

107 of the Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. §§ 9601, *et. seq*., and the New York state common law theories of

restitution, subrogation, and indemnity against National Service Industries, Inc. ("Defendant" or

"NSI") to recover response costs associated with the cleanup of hazardous waste at the

Blydenburgh Landfill in Islip, New York. The State alleges that NSI is the legal successor of

Serv-All Uniform Rental Corp. ("Serv-All URC") and as such is liable for Serv-All URC's illegal actions in arranging for the disposal of hazardous waste at the Landfill in 1978.

Serv-All URC was a New York corporation owned and operated by Ralph Colantuoni ("Colantuoni") and William Lepido ("Lepido"), who were also its sole shareholders. Serv-All URC operated out of a facility located at 8 Drayton Avenue, Bay Shore, New York, which was owned by Colantuoni and Lepido d/b/a 8 Drayton Ave. Associates. Serv-All URC was in the uniform rental business, and as part of that business it would clean the uniforms using both dry cleaning and water wash procedures. Serv-All URC serviced approximately five hundred customers.

In 1979, the New York Department of Environmental Conservation ("DEC") ruled that in 1978 Serv-All URC illegally arranged and paid for the disposal of over fifty drums containing the hazardous chemical perchloroethylene, which had been generated by its dry cleaning operations, into the Blydenburgh Landfill, following testimony by Colantuoni before the DEC to that effect. In 1983, the Blydenburgh Landfill was listed on the New York Registry of Hazardous Waste Sites ("New York Registry") under the name "Vinyl Chloride Plume." Vinyl chloride is a hazardous substance and a well-known product of the decomposition of perchlorethylene. The 1983 New York Registry listing confirmed disposal of oil, perchlorethylene, and vinyl chloride at the site beginning in 1978. By 1985, the DEC had traced the source of the vinyl chloride to Serv-All's facility at 8 Drayton Avenue, and the site name was changed to "Serv-All Laundry" in the 1985 New York Registry listing. The Blydenburgh Landfill was proposed for listing on the U.S. Environmental Protection Agency's National Priority List in January 1987.

On or about October 18, 1988, Colantuoni and Lepido entered into an Asset Sale Agreement ("Agreement") with Initial Service Investments, Inc. ("Initial") pursuant to which Initial paid Serv-All URC over two million dollars in cash in consideration for certain enumerated assets. This transaction was negotiated at arms-length and neither Lepido nor Colantuoni had any connection to Intial prior to or subsequent to the sale. The purchase price was derived from Serv-All's revenues as an ongoing operation, as well as its inventory and accounts receivable.

Under the terms of the Agreement, Initial acquired all rights, title, and interest in Serv-All URC's contracts and accounts for industrial service to its garment supply customers. Initial also acquired Serv-All's customer records, inventory, accounts receivable, trucks, office supplies, rail system, and all rights to the Serv-All name.

Pursuant to the Agreement, Initial agreed to assume certain specific obligations held by Serv-All, including obligations to perform under its customer contracts. Apart from these enumerated exceptions, Initial disclaimed any intention to assume or agree to pay, perform, or discharge any of Serv-All's debts, obligations, or liabilities.

As part of the Agreement, Initial required Colantuoni and Lepido to sign separate agreements not to compete with Initial for seven years in New York, New Jersey, and Connecticut. Initial further required Colantuoni and Lepido to stop using the trade name "Serv-All URC" or any variation thereof and to change its corporate name as soon as possible after the sale. Immediately upon execution of the Agreement, Colantuoni and Lepido changed Serv-All URC's name to C-L Dissolution Corp. and adopted a plan of complete liquidation and

dissolution of Serv-All URC.  C-L Dissolution Corp. was formally dissolved on January 27, 1989.

After entering into the Agreement, Initial hired several of Serv-All URC's employees, including its drivers and one of its managers.  Initial continued to provide the same uniforms and service that had been provided by Serv-All (with the exception of dry cleaning services), charged the same rates, used the same delivery trucks, assumed Serv-All's phone number, and sent invoices to customers under the trade name "Consolidated Laundry, Inc., Serv-All Division." Initial operated the uniform rental business out of its formerly unused depot in Lindenhurst, New York.

NSI acquired all shares of Initial stock on November 6, 1992.  On August 31, 1995, Initial merged into NSI.

*PROCEDURAL HISTORY*

The sole issue on summary judgment is whether NSI is Serv-All URC's legal successor. This issue was previously decided by Judge Mishler, who granted partial summary judgment to the State on February 16, 2001, after holding that NSI was Serv-All's legal successor under the "substantial continuity" test, an expansion of one of the traditional exceptions to the general common law rule protecting asset purchasers from successor liability.[1]  *New York v. Nat'l Serv.*

---

[1]  Under traditional common law principles, an asset purchaser is only liable for the liabilities and debts of its predecessors if one of the following four exceptions applies: (1) the successor expressly or impliedly agrees to assume such liabilities; (2) the transaction may be viewed as a "de facto" merger or consolidation; (3) the successor is a "mere continuation" of the predecessor corporation (sometimes referred to as the "identity rule" because it requires an identity of stock, stockholders, and directors between the two corporations); or (4) the transaction is fraudulent.  *See B.F. Goodrich v. Betkoski*, 99 F.3d 505, 519 (2d Cir. 1996) (citing *United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir. 1992).

*Indus.*, 134 F. Supp. 2d 275 (E.D.N.Y. 2001) (Mishler, J.). Judge Mishler relied heavily on the

Second Circuit's decision in *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1996), which held

that CERCLA does provide for successor liability, and that such liability is to be analyzed under

the CERCLA-specific substantial continuity test. The court in *Betkoski* adopted the substantial

continuity standard, which applies an eight factor test[2] to determine whether "the essential and

relevant characteristics of the selling corporation survive the asset sale," as a part of federal

common law due to its concern that application of the more strict state common law "identity

rule" would defeat the remedial goals of CERCLA by allowing responsible parties to escape

liability. *Nat'l Serv. Indus.*, 134 F. Supp. 2d at 278.

Following Judge Mishler's ruling on the successor liability issue, the State moved for

summary judgment on the issue of CERCLA liability. Judgment was entered against NSI and

the company was ordered to pay the State $12,477,254.42 for closure and remediation of the

Landfill as well as all future response costs that arose from cleanup of the site. *See New York v.

Nat'l Serv. Indus.*, 208 F.R.D. 38 (E.D.N.Y. 2002) (Spatt, J.).

On appeal, the Second Circuit vacated the judgment against NSI, holding that the

"substantial continuity" test was no longer good law following the Supreme Court's decision in

*United States v. Bestfoods*, 524 U.S. 51 (1998), and that the issue of successor liability must be

determined by reference to traditional corporate law principles. *New York v. Nat'l Serv. Indus.*,

352 F.3d 682, 685-87 (2d Cir. 2003) ("*NSI II*"). In *Bestfoods*, the Supreme Court held that

---

[2] The factors considered under the substantial continuity test are: (1) retention of the same
employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities
in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of
the same general business operations; (7) continuity of assets; and (8) whether the enterprise holds itself
out as a continuation of the previous enterprise. *Town of Oyster Bay v. Occidental Chemical Corp.*, 987 F.
Supp. 182, 206 (E.D.N.Y. 1997).

"CERCLA is thus like many another congressional enactment in giving no indication 'that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute.'" *Bestfoods*, 524 U.S. at 63 (quoting *Burks v. Lasker*, 441 U.S. 471, 478 (1979)).  The Court concluded that congressional silence on the issue of a parent corporation's derivative liability under CERCLA does not allow for the abrogation of traditional common law rules in that arena through the creation of a special federal rule.  *Id.* at 62-63.  In *NSI II*, the Second Circuit applied these principles to the successor liability context to hold that, because the substantial continuity test "is not a sufficiently well established part of the common law of corporate liability," it cannot be used to determine whether an asset purchaser takes on CERCLA liability.  *NSI II*, 352 F.3d at 686.

On remand, NSI has renewed its motion for summary judgment on the issue of its liability as a legal successor to Serv-All URC.

*DISCUSSION*

I.     Standard of Review

Summary judgment is appropriate where "there is no genuine issue as to any material fact" such that the moving party is entitled to "judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'"  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  To be "genuine," an issue of fact must be supported by evidence "such that a reasonable jury could return a verdict for the nonmoving party," *Holtz*, 258 F.3d at 69, and "a court must resolve all ambiguities and draw all reasonable

inferences against the moving party." *Alston v. New York City Transit Auth.*, 2003 U.S. Dist. LEXIS 21741, at *4 (S.D.N.Y. Dec. 3, 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

II.      Choice of Law

The parties agree that successor liability on the state common law claims must be analyzed under New York's common law rules. However, the State and NSI disagree over whether federal or state common law rules of successor liability should be applied to the CERCLA claim. In *Bestfoods*, the Supreme Court pointedly declined to decide whether the "traditional common law principles" of corporate veil piercing to be applied to subsidiary liability claims under CERCLA should be drawn from federal common law or from the common law of the forum state. *Bestfoods*, 524 U.S. at 63 n.9. However, the Court did note that congressional silence on the issue could not be taken to mean that the "entire corpus of *state corporation law* is to be replaced simply because a plaintiff's cause of action is based upon a federal statute." *Id.* at 63 (emphasis added).

The Second Circuit's decision in *NSI II* contains a cryptic discussion of the issue that does little to clarify which body of case law this Court should apply on remand.[3] The Second Circuit's holding – that the substantial continuity test is no longer good law after *Bestfoods*

_____

[3] NSI argues that this Court must continue to apply federal common law to the issue of successor liability under CERCLA because it is the "law of the case." While it is true that under the law of the case doctrine a trial court cannot consider on remand an issue decided by the appellate court, *Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 148-49 (2d Cir. 1999), the Second Circuit did not reach any holding on this issue and this Court is, therefore, free to reconsider which law should apply. *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1995 U.S. Dist LEXIS 16554, at *4 (S.D.N.Y. Nov. 8, 1995) ("[D]istrict courts retain discretion to reconsider, on remand, any issues that the Circuit Court did not 'expressly or implicitly' decide.").

because it is not part of general federal common law – certainly implies that whatever in fact is part of federal common law should govern the analysis. This argument is furthered by the court's statement that the substantial continuity test, if widely adopted among state courts, "might be considered absorbed into federal common law and thus applied under CERCLA." *NSI II*, 352 F.3d at 687. However, this seemingly clear mandate is undermined by footnote 1 of the opinion, in which the court noted that it originally selected federal law in *Betkoski* instead of borrowing from state law because of its concern that application of the "inflexible and easily evaded" identity rule would defeat the goals of CERCLA. *Id.* at 686 n.1. The court mused that in light of its holding that the substantial continuity doctrine could no longer be applied as a matter of federal law, the analysis prescribed by the Supreme Court in *United States v. Kimbell Foods*, 440 U.S. 715 (1979), for determining when state versus federal common law should be used "would likely come out differently now" because a state's "mere continuity" rule is likely to be the same as the federal one in the absence of substantial continuity and might even facilitate CERCLA's objectives if the state itself has adopted the substantial continuity test as part of its common law.[4] *Id.* The State focuses on this footnote to support its argument that the Court should apply New York state common law to the CERCLA claim because its application no longer conflicts with the goals of the federal statute (the key *Kimbell Foods* factor) and would actually further CERCLA's remedial purposes because it provides a more liberal and flexible *de facto* merger analysis that is more likely to impose liability on successor corporations.

---

[4] The three factors to be weighed under the *Kimbell Foods* analysis are (1) the need for uniformity under the federal law; (2) whether application of state law would frustrate specific objectives of the federal program and (3) the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

Other courts clearly share the Second Circuit's confusion as to the continued viability of federal common law as the source for successor liability law in CERCLA actions. *See North Shore Gas Co. v. Salomon*, 152 F.3d 642, 650-51 (7th Cir. 1998) (noting the erosion of the federal common law standard in the wake of the Supreme Court's decisions in *Bestfoods* and in both *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), and *Atherton v. FDIC,* 519 U.S. 213 (1997)[5], but reserving the choice of law issue for a case where the parties argued the issue and continuing to rely on federal common law); *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant*, 159 F.3d 358, 362-64 (9th Cir. 1997) (questioning its previous decision to apply federal common law to CERCLA actions in light of Supreme Court precedent in *O'Melveny* and *Atherton* but finding no need to overrule it as federal common law mirrored the state successor liability laws at issue). However, in *United States v. Davis*, 261 F. 3d 1, 53-54 (1st Cir. 2001), the First Circuit held that the Court's decision in *Bestfoods* confirmed that state corporation law should be applied in CERCLA cases unless it would frustrate the federal interests underlying CERCLA. The court in *Davis* found that the Supreme Court had applied state corporation law to the issue of parent/subsidiary liability under CERCLA and "left little room for the creation of a federal rule of liability under the statute." *Id.* at 54. This reading of *Bestfoods* is somewhat oversimplified, however, as the Supreme Court did not affirmatively apply state law but merely refused to disturb the Sixth Circuit's application of the state law of veil piercing because the parties had not challenged the appellate court's holding on the issue of indirect liability. *See Bestfoods*, 524 U.S. at 63 n.9. The Court specifically noted the disagreement among courts over

---

[5] These cases hold that courts should not fashion federal common law rules except in the few and restricted instances involving a significant conflict between state law and the federal interest at issue.

whether state or federal law should apply and declined to reach the issue because, as noted, it had no need to do so, though it did hint that the presence of a federal statute as a basis for a claim should not, as a rule, displace state corporation law.  *Id.*

The only New York court to take up this issue in light of the Second Circuit's ruling in *NSI II* is *New York v. Westwood-Squibb Pharm. Co.*, 2004 U.S. Dist LEXIS 13841, at *56-62 (W.D.N.Y. May 25, 2004).  In *Westwood-Squibb*, the court noted that *Betkoski* stands for two propositions: (1) that federal common law applies to CERCLA actions and (2) that the substantial continuity test applies to the analysis of the "mere continuation" exception.  *Id.* at 60. The court held that *NSI II* only abrogated the second holding of *Betkoski* as it relates to the viability of the substantial continuity doctrine and did not affect its holding that federal common law, as applied to the remaining exceptions, governs the analysis of successor liability for CERCLA actions.  *Id.* at 61-62.  When faced with a similar situation in *United States v. Exide Corp.*, 2002 U.S. Dist. LEXIS 3303, at *14-20 (E.D. Pa. Feb. 27, 2002), the Eastern District of Pennsylvania noted that the holdings in *Atherton*, *O'Melveny*, and *Bestfoods* could be construed to undermine the justification for applying federal common law in CERCLA cases, but held that in the absence of any authoritative precedent (neither *Atherton* nor *O'Melveny* involved a cause of action created under a federal statute like CERCLA and the Court declined to decide the issue in *Bestfoods*) it remained bound by prior Third Circuit precedent in *Smith Land & Improv Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988), to apply federal common law.

In the absence of an explicit holding by the Second Circuit that *Betkoski*'s mandate to apply federal common law in CERCLA cases has been overruled, this Court likely remains bound by that decision.  However, as the Court finds that NSI cannot be held liable under either

federal or state common law, it is unnecessary for purposes of this motion to definitely resolve the choice of law issue.

III.    *De Facto* Merger Exception

As previously noted, under traditional common law principles, a corporation acquiring the assets of another does not succeed to the liabilities of the successor corporation, except where (1) the successor expressly or impliedly assumed the liability; (2) there was a *de facto* merger of the successor and predecessor; (3) the successor was a "mere continuation" of the predecessor; or (4) the transaction was fraudulent.  *See Betkoski*, 99 F.3d at 519; *Schumacher v. Richards Shear Corp.*, 451 N.E.2d 195, 244-45 (N.Y. 1983).   The State previously relied on the substantial continuity test, which was a judicially created federal rule expanding the traditional "mere continuation" exception for CERCLA purposes, to argue for NSI's successor liability. However, in light of the Second Circuit's holding that the substantial continuity test is no longer good law, the State now maintains that NSI is liable for Serv-All's environmental liabilities under the second exception, the *de facto* merger doctrine.

Courts look to the following four factors to determine whether a *de facto* merger of the predecessor's business has occurred: (1) continuity of ownership; (2) continuity of management, personnel, physical location, assets and general business operations; (3) dissolution of the selling corporation; and (4) assumption by the successor of those liabilities ordinarily necessary for the continuation of the predecessor's business.  *See Arnold Graphics Indus. v. Indep. Agent Ctr.*, 775 F.2d 38, 42 (2d Cir. 1985).  NSI does not appear to dispute the existence of the last three factors, which in any event would almost certainly be met based on the undisputed facts that Serv-All

adopted a plan of complete dissolution on the day of the sale and legally dissolved soon after, that Initial took over and agreed to perform under Serv-All's existing customer contracts, and that Initial acquired not only the vast bulk of Serv-All's physical and intangible assets but also employed many of its key employees and, with one exception (not dry cleaning uniforms), continued Serv-All's business essentially as it had been.  But NSI argues that, despite the presence of these traditional indicators of a *de facto* merger, the exception is inapplicable because the first factor -- continuity of ownership -- is absent.  The State does not attempt to argue that continuity of ownership is present in this case, as it is undisputed that Initial paid cash for Serv-All's assets and that neither company ever owned shares of the other's stock or had any shareholders or directors in common.  However, the State argues that, under the current law of successor liability in New York, continuity of ownership is not required for a finding of a *de facto* merger but is merely an indication that a merger has occurred, to be balanced in a flexible manner with the remaining three factors, with no one factor being required or dispositive.

A.      Federal Common Law of Successor Liability

Without the substantial continuity doctrine, federal common law on the issue of successor liability mirrors the traditional rules formulated in *Arnold*, 775 F.2d at 42.  *See Westwood-Squibb*, 2004 U.S. Dist LEXIS 13841, at *61-62 (continuing to apply the *Arnold* test as part of federal common law following the Second Circuit's abrogation of the substantial continuity rule).  In *Arnold*, the Second Circuit, applying state law, held in the context of successor liability on a contract debt that in order to find a *de facto* merger "there <u>must</u> be a continuity of the selling corporation, evidenced by the same management, personnel, assets, and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of

stock; a dissolution of the selling corporation, and the assumption of liabilities by the purchaser."
*Arnold*, 775 F.2d at 42 (quoting *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 838 (S.D.N.Y. 1977) (emphasis added). The court then found that all four factors were met and that a *de facto* merger had occurred, noting that there is "no requirement that all of the events that are necessary to a finding of *de facto* merger occur at the same time." *Id.* at 42. This language indicates that the Second Circuit's view in *Arnold* was that all four factors had to be met before it could be held that a *de facto* merger had occurred, and other courts have so interpreted it. *See In re Augie/Restivo Baking Co. Ltd.,* 860 F.2d 515, 519-20 (2d Cir. 1988) (referring to the four *de facto* merger elements cited by *Arnold Graphics* as "prerequisites"); *Cargo Partner AG v. Albatrans, Inc.*, 207 F. Supp. 2d 86, 97 (S.D.N.Y. 2001) (referring to the factors as the "four requirements for finding a de facto merger"). Because continuity of ownership is a requirement under the *Arnold* test, it is also a requirement under federal common law in its current formulation. *See New York v. Westwood-Squibb,* 981 F. Supp. 768, 787 (W.D.N.Y. 1997) (requiring all four elements of *Arnold* to be met before finding that a *de facto* merger had occurred). Thus, NSI cannot be deemed Serv-All's legal successor under federal common law.


B.      New York State Law of Successor Liability

        The New York Court of Appeals has not yet ruled on whether continuity of ownership is a prerequisite for the finding of a *de facto* merger. Thus, this Court must try to predict how the state's highest court would rule on the issue by looking to decisions of the Second Circuit

construing state law, as well as intermediate state court precedent, analogous cases in other circuits and any other sources that provide helpful guidance in deciding the issue. *Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 89-90 (S.D.N.Y. 2002).

          1.        Second Circuit Caselaw

The Second Circuit recently defined the contours of the New York *de facto* merger doctrine in *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44-48 (2d Cir. 2003). The issue came to the court on a certified question from the district court asking whether application of the *de facto* merger doctrine in its current formulation calls for a weighing of the four traditional factors set forth in *Arnold* or whether all four factors are required. *Id.* at 44. The Second Circuit noted that language in some state court cases had implied a relaxation of the *Arnold* standard for finding a *de facto* merger in which the four factors were considered merely "hallmarks" of a merger and the presence of all four was not required. *Id.* at 46. However, the court then went on to hold that it had no need to resolve the asserted conflict because whether or not all four factors are required, "the doctrine of de facto merger in New York does not make a corporation that purchases assets liable for the seller's contract debts absent continuity of ownership" because "continuity of ownership is the essence of a merger." *Id.* at 46-47. In an asset sale, by contrast, the seller's ownership interest in the entity is given up in exchange for consideration: "the parties do not become owners together of what formerly belonged to each." *Id.* at 47. Thus, continuity of ownership, while perhaps not sufficient to show a *de facto* merger, is necessary to show that a merger has effectively occurred. *Id.* The court noted that even in *Fitzgerald v. Fahnestock & Co.*, 730 N.Y.S.2d 70 (App. Div. 2001), and *Ladenburg Thalmann & Co. v. Tim's Amusement's, Inc.*, 712 N.Y.S.2d 526 (App. Div. 2000), the state court cases primarily relied on for their

language indicating that not all of the factors may be necessary to find a *de facto* merger, there was a continuity of ownership through shared ownership of the corporations' stock. *Id.*

The State argues that the holding in *Cargo Partner* is limited to application of the *de facto* merger doctrine in <u>contract</u> cases and that the Second Circuit's prior holding in *Nettis v. Levitt*, 241 F.3d 186 (2d Cir. 2001), which it claims adopted a more liberal standard for finding a *de facto* merger, binds the Court in this CERCLA action. *Nettis* was a "whistleblower" case brought pursuant to a New Jersey anti-retaliation statute. After holding that New Jersey and New York laws on successor liability are the same, the court noted that "[i]n both states, when a successor firm acquires substantially all of the predecessor's assets and carries on substantially all of the predecessor's operations, the successor may be held to have assumed its predecessor's tort liabilities, notwithstanding the traditional rule that a purchaser of corporate assets does not assume the seller's liabilities." *Id.* at 193. After citing the traditional four factor test, the *Nettis* court noted that "[t]hese factors are to be analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance 'it was the intent of the successor to absorb and continue the operation of the predecessor.'" *Id.* at 194 (quoting *Woodrick v. Jack J. Burke Real Estate, Inc.*, 703 A.2d 306 (N.J. Super. Ct. 1997)). Applying these state law principles, the Second Circuit held that the district court had erred in holding that the defendant could not be subject to successor liability under the *de facto* merger exception because the transaction was structured as an asset purchase for cash and the asset purchase agreement expressly limited the purchaser's liability, noting that these facts "represent just the sorts of formalities that the *de facto* merger doctrine ignores." *Id.*

If there were a direct conflict between *Cargo Partner* and *Nettis*, as the State argues, then attempting to distinguish them by the types of claims at issue in each case, *i.e.*, contract or tort, might well be the only course to follow. However, a close reading of the cases indicates that there is no such conflict. *Cargo Partner* requires that there be some evidence of continuity of ownership before a *de facto* merger can be found. Nothing in *Nettis* explicitly contradicts this holding or states that any of the four factors may be wholly absent in finding a *de facto* merger. Rather, *Nettis* indicates that the evidence supporting each of the four factors is to be "analyzed in a flexible manner that disregards mere questions of form." *Nettis*, 241 F.3d at 193-94. Analyzing continuity of ownership in a flexible manner would not include focusing exclusively on whether the assets were sold in exchange for stock in the successor corporation, as that is merely one way, albeit the traditional and most common way, in which continuity of ownership may be shown. As the parties in *Nettis* were still at the motion to amend stage and had not yet engaged in discovery, it was unclear whether any other indicia of ownership continuity might be present. As a result, the Second Circuit found that the district court had erred in holding that a *de facto* merger claim against the successor defendants would be clearly futile. *Id.* at 194. Read together in this fashion, *Cargo Partner* and *Nettis* stand for the proposition that some evidence of continuity of ownership is required to find that a *de facto* merger has occurred, but that there is no one particular type or quantum of evidence that must be shown for purposes of this analysis. *See Miller v. Forge Mench P'ship*, 2005 U.S. Dist. LEXIS 1524, at *20-27 (S.D.N.Y. Feb. 2, 2005) (citing both *Cargo Partner* and *Nettis* in its discussion of the *de facto* merger exception and holding that, while some showing of ownership continuity is required, complete uniformity is not necessary and nominal changes in corporate form will not defeat a showing that a *de facto* merger has

occurred).  Under this standard, NSI cannot be held to be Serv-All's legal successor, as there is no evidence in the voluminous record from which this Court could find any continuity of ownership between the two companies, unless this case falls within the exception discussed below.

2.      Products Liability Exception

In its opinion in *Cargo Partner*, the Second Circuit acknowledged that some states, as well as some lower courts in New York, have relaxed the continuity of ownership requirement in products liability cases.  However, the court observed that the New York Court of Appeals declined to adopt this more liberal standard in *Schumacher v. Richards Shear Co.*, 451 N.E.2d 195 (N.Y. 1983), which was a products liability case.  The Court then noted that the exception "has never been applied, in [New York] or elsewhere, outside of the products-liability context. This apparently reflects its use, specific to that area of law, to maintain strict liability for products despite the transfer of the assets that were used to produce them."  *Cargo Partner*, 352 F.3d at 47-48.  While this statement by the Second Circuit would seem to cabin the exception to products liability cases, the State argues that it applies as well to the CERCLA and state common law claims at issue in this case because they are analogous strict liability theories.  This argument is unpersuasive for several reasons.

First, the State has not come forth with a single New York state case applying the relaxed continuity of ownership requirement to CERCLA or indemnity and restitution claims such as those at issue in this case.  The State is, therefore, asking this Court to extend an exception that has been very clearly and carefully limited to the specialized arena of products liability law to cover a broad array of tort and contract law claims, without any legal precedent in this Circuit for doing so.

Second, the State's attempt to argue that its common law claims of unjust enrichment/restitution, subrogation, and indemnity are grounded in strict liability runs afoul of well-established authority indicating that these causes of action are based in contract and have even been termed "quasi-contractual" causes of action. *McDermott v. New York*, 406 N.E.2d 460, 462-63 (1980) (noting that the rights to indemnity and restitution spring from contract and are not dependent on the nature of the underlying breach). Moreover, in the related case of *New York v. Hickey's Carting, et. al.*, No. 01 Civ. 3136 (E.D.N.Y. Mar. 30, 2005), the State argued extensively, and successfully, in its opposition to the motion to dismiss that the same common law claims did not sound in tort and therefore were not governed by New York's three year statute of limitations for tort actions. The doctrine of judicial estoppel holds that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks and citation omitted). Thus, the State is judicially estopped from arguing that these quasi-contractual claims sound in strict liability or tort.

Third, the State's attempt to draw parallels between products liability and CERCLA claims falters because the policy considerations underlying application of the relaxed *de facto* merger standard are peculiar to the manufacturing defect context. The courts that pioneered the exception in *Turner v. Bituminious Casualty Co.*, 244 N.W.2d 873, 877-82 (Mich. 1976), and *Ray v. Alad*, 560 P.2d 3, 31 (Cal. 1977), did so to address the special policy concerns raised by manufacturing defect cases, which include the virtual destruction of a plaintiff's remedies caused

by the successor's acquisition of the business, the successor's superior ability, when compared to the innocent consumer, to assume the original manufacturer's risk-spreading role and to improve the product's safety, and the fairness of requiring the successor to bear responsibility for injuries stemming from a defective product that it continues to manufacture as concomitant to the goodwill it obtains by holding itself out as a continuation of its predecessor.

Several courts have noted that these policy rationales do not translate well to other tort actions. In *Leo v. Kerr-McGee Chem. Corp.*, 37 F.3d 96, 99-102 (3d Cir. 1994), the Third Circuit declined to apply the expanded successor liability exception to a toxic tort claim where the successor corporation never acquired the polluted property. The court noted that imposing liability in such circumstances would impede commercial transactions by requiring all asset purchasers to make a full assessment of the environmental risks associated with any property or facility where the product had been manufactured and then to acquire insurance against any potential environmental liability. *Id.* at 100. The court held that these negative commercial consequences could not be justified by policy considerations, as there could be no risk spreading benefit to imposing liability on a successor that never owned the land (as it is impossible to undertake cleanup on land that one does not own) and it would be unfair to require the successor corporation to assume liability as concomitant to the goodwill obtained from the purchase, as any goodwill would attach to the product line acquired and not to the site of manufacture. *Id.* These principles apply with equal force in the instant case, as NSI, through Initial, never acquired the property where Serv-All disposed of the hazardous waste.

Moreover, the State has presented no authority, and this Court has found none, which elevates the desire to reimburse the State for money expended in cleaning up hazardous waste

sites to the same level of importance as the need to protect victims injured by defective products from being left without a remedy.  In *Red Arrow Prods. Co. v. Employers Ins. of Wausau*, 607 N.W.2d 294, 302-03 (Wisc. 2000), a CERCLA case, the court held that "the need to spread the costs associated with environmental cleanup has not risen to the same level of public concern as the need to protect otherwise defenseless victims of manufacturing defects...the policy reasons that bolster rules of strict liability and product-line successor liability do not support their application in the present case."

Finally, the teachings of the Supreme Court in *Bestfoods* counsel against extension of the relaxed *de facto* merger exception to the CERCLA context.  In *Bestfoods*, the Supreme Court upheld two "fundamental principle[s] of corporate law" against attempts to create CERCLA-specific rules designed to further the statute's remedial purpose.  *Bestfoods*, 524 U.S. at 61-64. With respect to the traditional rule of limited liability for a corporation's shareholders, the Court noted that while "this respect for corporate distinctions when the subsidiary is the polluter has been severely criticized in the literature, nothing in CERCLA purports to reject this bedrock principle, and against this venerable common-law backdrop, the congressional silence is audible." *Id.* at 62 (citations omitted).  The lesson of *Bestfoods* appears to be that a court should not fashion a CERCLA-specific rule of liability where one already exists in corporate law, even when the common law rule has been charged with placing formal distinctions above CERCLA's public policy concerns, unless authority to do is found in the explicit language of the statute itself. Applying the products liability exception to the CERCLA claims at issue here would violate this mandate by effectively resurrecting the substantial continuity test through application of CERCLA-specific policy rationales to the realm of traditional corporate successor liability law.

This Court therefore declines to extend the expanded successor liability exception beyond its products liability origins to apply to the CERCLA and common law claims at issue in this case. Thus, NSI cannot be deemed Serv-All's legal successor for purposes of such claims.

*CONCLUSION*

NSI is not Serv-All's legal successor and is therefore not the proper defendant for the State's CERCLA and common law claims. All claims against NSI are hereby dismissed.

**SO ORDERED**.

_____S/_____
SANDRA L. TOWNES
UNITED STATES DISTRICT JUDGE

Dated:        July 28, 2005
              Brooklyn, NY